THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT S. ROPER, Defendant-Appellant.

Third District    No. 80-640

Opinion filed July 30, 1981.

James R. Carter, of Peoria, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SCOTT delivered the opinion of the court:

In this appeal following his conviction for robbery, the defendant, Robert S. Roper, challenges only the propriety of the six-year term of imprisonment imposed upon him. The defendant argues that the imposition of this sentence was an abuse of discretion in that the sentence is excessive. However, to determine whether an abuse of discretion occurred, the facts of the case must be reviewed.

The defendant was charged by information with armed robbery and robbery on November 26, 1979, based on an incident at the High View Hills Country Club. This case was assigned No. 79-Y-2446. A true bill of indictment was later returned on the same charges. Subsequently, the defendant was charged with home invasion and related misdemeanors arising out of an incident occurring on or about December 12, 1979, which case was given No. 79-Y-2577.

The defendant filed, on December 20, 1979, a notice of possible insanity and incompetence defense and motion for continuance. A hearing was held on December 28, 1979, and Mortimer Beck, M.D., was ordered to examine the defendant for the purposes of determining his sanity and fitness to stand trial. Subsequently, the trial court entered an order that T. W. Matthews, clinical psychologist, was also to examine the defendant for the purpose of determining his fitness to stand trial.

On February 13, 1980, a hearing was held to determine the defendant's fitness to stand trial. At that time, both parties stipulated to the admission of the reports of Dr. Beck and Mr. Matthews into evidence. Additional evidence at the time of the hearing was presented by way of the testimony of Sergeant Dennis Schultz of the Tazewell County

Sheriff's Department. At the conclusion of the hearing the State indicated that they would concur that the defendant was hampered in his ability to assist in his own defense and would not, therefore, oppose the motion. The trial court found the defendant unfit to stand trial at that time.

However, on May 23, 1980, the defendant was returned to the trial court and after a brief hearing was found, at that time, fit to stand trial. Thereafter, on August 7, 1980, the defendant filed a notice of insanity defense with the circuit court. The trial court entered, on motion of the parties, an order that the defendant be released from custody, on his own recognizance, to voluntarily submit himself to the Department of Mental Health at the Zeller Zone Center. The court so ordered, and the recognizance bond was issued. The defendant was subsequently returned to the custody of the sheriff after being released from in-patient care.

On October 14, 1980, the parties presented to the trial court a partially negotiated plea agreement. The defendant pleaded guilty to the charge of robbery. The armed robbery count in case No. 79-Y-2446, as well as all charges in case No. 79-Y-2577, were dismissed.

The factual basis for the guilty plea follows. Richard S. Belcher would testify that on November 24, 1979, he was the manager of the High View Hills Country Club at 2217 High View Road in near East Peoria, Tazewell County, Illinois. On that evening he was on duty as the manager and at approximately 9 p.m. the defendant came into the club, which is a tavern. The defendant was admitted after paying a cover charge and was in the club for approximately an hour when he was asked to leave by another employee. The defendant returned at approximately 10:45 p.m. and entered the tavern with a blue steel automatic pistol in his hand, stuck the weapon in Belcher's face, and demanded money. Belcher handed the defendant $40 or $50, whereupon the defendant backed out of the lobby. As he was exiting through the outside door he pulled the trigger of the weapon twice. It made a clicking sound which showed it was not loaded. Belcher and some patrons then caught and subdued the defendant, who was injured and later hospitalized as a result of being apprehended.

Detective Mark Williams would testify that on the 12th day of December 1979, he was employed as a Tazewell County deputy sheriff and that at approximately 5 a.m. on that date he had a conversation with the defendant at the Tazewell County Jail. Prior to that conversation, the defendant was advised of his *Miranda* rights. Nevertheless, the defendant admitted he was in fact the person who had gone into the High View Hills Country Club with the weapon. The weapon was not loaded, and the defendant only intended to get the money back that he had paid for the cover charge. The People would call additional witnesses at trial who would testify to essentially the same facts.

After accepting the defendant's guilty plea, a presentence report was

ordered and a sentencing hearing was set for November 20, 1980. At the sentencing hearing the State called witnesses to testify as to the occurrence which resulted in the indictment given No. 79-Y-2577, relating to events which transpired on or about the 12th of December, 1979. The first witness, Gloria Antonini, stated that in the early morning hours she was awakened by the defendant in her home. He was wearing a helmet on his head, had a knife in one hand and a hatchet in the other. When she started to scream, the defendant dropped the knife and hatchet, came at her, knocked her down and began choking her. However, the only injury she received was some scratches on her neck. There was no evidence showing that the defendant either threatened to use or attempted to use the weapons in his possession at any time during the incident.

Gloria Antonini additionally testified that the defendant tore some phones out, then, in response to her questions, indicated that if she would "give his instruments" back he would leave. She gave the "instruments" to him and he left. She testified further that the defendant was in her home approximately 20 minutes. She further testified that the defendant was dressed in a plaid jacket with a necktie and that his hair was longer and he was thinner at the time of the incident than at the time of the sentencing hearing.

Mollie Antonini, Gloria's mother-in-law, was also called as a witness in aggravation. She substantially confirmed the testimony of Gloria Antonini in regards to the events that took place. According to Mollie, her daughter-in-law was turning blue as a result of defendant choking her. She did, additionally, indicate that she too was involved in a scuffle with the defendant during which she struck him with a broom and he knocked her against a wall. Mollie also observed that before leaving the defendant pulled two telephones out of the wall.

Defendant called witnesses to testify as to mitigating factors and circumstances. Two of those witnesses were Roy Roper and Margaret Roper, the parents of the defendant. Margaret testified that she became aware of a significant change in the defendant's personality sometime after he received a crushing injury to his pelvic area. This injury resulted in a possibility of permanent organic impotence to the defendant and required a protracted period of medical help by way of surgeries following the incident. In response to a question concerning what he was like prior to the accident, she indicated that "he was highly religious and easy to get along with and helped on the farm a lot." His father indicated that he had previously been a hard worker.

Dennis Shultz, a sergeant with the Tazewell County Sheriff's Department, was also called as a witness by the defendant. Sergeant Shultz, in his testimony, indicated that he was presently a jail administrator and had, over the period of time he was so employed, come into contact with the

defendant. At the time of his first contact with the defendant, he was behaving in a very "spooky" fashion. Sergeant Shultz had testified at the previous hearing to determine the defendant's fitness to stand trial. In response to a question concerning what, if any, changes had been noticed in the defendant's condition and attitudes after his return from Chester Mental Health Center, where the defendant had been assigned pursuant to the court's previous order finding the defendant unfit to stand trial, Sergeant Shultz testified:

> "Since his return from Chester he's—as far as I'm concerned—he has improved very greatly. His actions, his manners, his cleanliness, his speech—he knows what he's talking about now. Any of his letters that go out, anything that he writes, talks about, he does very well at. He knows exactly what is going on at all times. To us right now, he has taken himself off whatever medication that was prescribed for him. He asked himself to be taken off it. He does not take any at all now. He's about as close to what you would say a model prisoner as we've got over there. If you need to know something from him you have to go ask him. You don't know he's back there."

The final witness called by the defendant was Mr. T. W. Matthews, a clinical psychologist. Mr. Matthews' report, dated February 11, 1980, had been filed with the court and stipulated to by both parties during the course of the earlier hearing which resulted in the defendant being found unfit to stand trial. Matthews testified that he had again examined the defendant in August of 1980 and, at that time, found the same condition existed concerning the defendant, but in a "substantially ameliorated form. The severe disturbance, the acuteness of the process had been diminished very substantially and the level of integration in terms of his ability to appreciate and distinguish between mental images and reality had substantially improved at the time of the second examination."

As a result of his examination, Matthews was able to opine that the defendant would continue to function in a somewhat unusual fashion but without any of the dramatic disturbances that were characteristic of his behavior prior to the time of his initial examination. Matthews further testified that, in his opinion, incarceration would not only fail to benefit this particular defendant, but would in all likelihood operate to the detriment of the continued improvement of the defendant's mental state. Additionally, Matthews also indicated that, based upon his experiences of and studies made on recidivistic acts and the personality types that were consistent with the high degree of probability of recidivism, it would be his opinion that the defendant would not fall within a category of probable recidivism.

Matthews had been made aware of the medical treatment the defend-

ant had received as a result of the crushing injury which occurred in May of 1979. In response to a question concerning the effect of that type of a traumatic injury to an individual such as the defendant, he stated:

> "That kind of injury has the potential for being a very traumatizing kind of experience emotionally,—particularly, where impotence is involved there is a very high probability that you will see gross stress reaction even in individuals who have no preexisting personality difficulty. Then the extensity may be quite common, quite great."

Matthews viewed the defendant as not being an essentially drug dependent or alcoholic personality. He went on to state, "I would not anticipate that he of his own volition would seek out excessive amounts of alcohol or excessive amounts of drugs. My impression is that this dependency developed in the course of his treatment for other severe physical injuries and that once that has been essentially broken that the likelihood of his voluntarily returning to that kind of dependency would be quite small." Finally, Matthews indicated that he felt the availability to the defendant of a nuclear type family situation for the defendant to return to would be significant and be a "very valuable plus in this circumstance." But Matthews did comment that the defendant's re-involvement with drugs and alcohol would precipitate a regression in the defendant's behavior.

During the colloquy between the trial judge and the defendant prior to sentencing, the sentencing judge referred to the report of Lalit Savla, M.D., which was included in the presentence investigation report. Among other things, Savla noted that the continued treatment of the defendant remained an "absolute priority." The trial judge also took into account the defendant's lack of prior criminal history or conduct, his traumatic injury and resulting disability, and his apparent mental and physical progress since he began receiving professional treatment. However, despite these factors, the trial judge was of the opinion that to place the defendant on probation would deprecate the seriousness of defendant's conduct and be inconsistent with the ends of justice. He noted in aggravation the defendant's drug and alcohol problems, that his progress in conquering these problems has been made solely in a limited and controlled environment, and that the victim's personal rights were seriously violated by his criminal conduct. The trial judge commented that the victims "are little concerned with the reason for the defendant's conduct. They have personal rights and they have been violated," and that "the victims don't care whether you had some personal injury."

In arguing an abuse of discretion, the defendant's contentions are several. Among the mitigating factors which the defendant claims the trial court should have given greater weight to are his lack of a prior criminal

record, that there was no physical harm to the victims, that his prior physical injury and the treatment therefor either provoked or excused or justified his actions, that his conduct was the result of circumstances unlikely to recur, and that incarceration would endanger his medical condition. See Ill. Rev. Stat. 1979, ch. 38, pars. 1005—5—3.1(1), (3), (4), (7), (8), and (12).

From the record, it is clear that the trial court considered the defendant's lack of a prior criminal record. As for threat of physical harm, in both the country club and Antonini home incidents, the defendant was armed with a weapon of some type, and in both instances the defendant's actions precipitated a fight. However, in the other incident it was the victim who received injuries. The trial court could conclude, therefore, that the defendant's acts did at least threaten serious physical harm, although no serious harm was actually inflicted. (See Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(1).) Nor can the defendant's prior physical injury be considered a provocation of or justification for his criminal conduct.

The defendant also attempts to tell us that the treatment for his injury caused drug dependence which, in turn, caused the behavioral change in him. These circumstances, according to the defendant, are unlikely to recur. However, we note as the trial court did, that the defendant used drugs while in the military, some time prior to his injury, and that Mr. Matthews warned of possible regression in the defendant's behavior should he become involved with drugs or alcohol. Thus the circumstances which resulted in the defendant's criminal behavior could recur.

Furthermore, there is no evidence which would require a sentencing judge to find a medical threat to the defendant from incarceration. It is true that Matthews felt incarceration would not benefit the defendant, but the trial court is not obligated to accept Matthews' opinion. Dr. Savla's report referred to continued treatment of the defendant as an "absolute priority." Moreover, the trial court found progress in the defendant's ability to conquer his alcohol and drug problems only when the defendant had been placed in a controlled environment.

■■ Another contention of the defendant is that the sentencing court erred by considering Dr. Savla's report at all, objecting to the report as regards reference to the defendant's prior drug abuse and alcohol problems. Of course, as a general rule, a trial court can not properly consider a psychiatric report which relates information concerning alleged improper conduct on the part of the defendant without having heard testimony from the reporting individual. (*People v. Kirk* (1978), 62 Ill. App. 3d 49, 378 N.E.2d 795.) The trial court must determine the reliability of such evidence before considering it. Unlike *Kirk*, however, the information provided here was relevant to the defendant's medical history, was

provided to the doctors by the defendant and his family, and was not a bare allegation of criminal conduct. As a result, the report was properly considered.

■■■ Lastly, the defendant cites us to *People v. Dimond* (1977), 54 Ill. App. 3d 1036, 370 N.E.2d 686, as an example of a case in which this court determined that a greater than minimum sentence for an offense was excessive. However, the circumstances of each case are unique and a determination of whether a sentence is proper must be based on the circumstances in that particular case. (*People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168.) Furthermore, the issue here is not whether this reviewing court will modify a sentence in an act of judicial clemency (*People v. Aristole* (1971), 131 Ill. App. 2d 175, 268 N.E.2d 227), but whether there was an abuse of sentencing discretion on the part of the trial court. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) We find no such abuse of discretion in this case.

For the foregoing reasons, the judgment of the Circuit Court of Tazewell County is affirmed.

Affirmed.

ALLOY and BARRY, JJ., concur.